**SECURITIES AND EXCHANGE COMMISSION, Petitioner,**

v.

**FIRST TENNESSEE BANK N. A. MEMPHIS, Respondent.**

No. 77–2778.

United States District Court, W. D. Tennessee, W. D.

Feb. 27, 1978.

---

Joseph L. Grant, James E. Long, Jane H. Heitman, Securities & Exchange Commission, Atlanta, Ga., for petitioner.

Michael F. Pleasants, Stephen D. Wakefield, Memphis, Tenn., for respondent.

## ORDER

WELLFORD, District Judge.

The Securities and Exchange Commission has filed an application in this Court for an Order to require obedience to a subpoena filed December 21, 1977. It seeks production of certain bank records pertaining to accounts of two customers pursuant to an investigation of that Commission purportedly within the bounds of its duly constituted authority.

The respondent Bank relies upon the Bank Privacy Act of 1977, T.C.A. § 45–2601(a) *et seq.*, as it may apply to such a subpoena, as limiting plaintiff's right in this regard. In addition, the Bank takes the position that the Attorney General should be joined under a duty, imposed by T.C.A. § 8–609(8) to defend the constitutionality of statutes enacted by the Tennessee Legislature. The Bank also takes the position that it should not be called upon to produce the records without the SEC's compliance with T.C.A. § 45–2604(a) which directs that such a subpoena be served upon the customer as well as the Bank, unless a court has waived service upon the customer for good cause.

Subpoenas issued by the SEC are issued pursuant to statutory authority, Section 19(b) of the Securities Act of 1933 and Section 21(b) of the Securities Exchange Act of 1934. By its terms, the Tennessee Bank Privacy Act of 1977 purports to apply to all lawful subpoenas which request fiduciary institutions to disclose financial records of their customers' accounts. No distinction is made between subpoenas issued by federal entities and those issued by state entities. It requires that a lawful subpoena requesting bank disclosure of financial records relating to the accounts of its customer be served upon the customer in addition to the fiduciary institution. It goes on to state that a court (which particular court is unspecified) for good cause may waive service of the subpoena upon the customer. T.C.A. § 45–2604(a) (Supp. 1977).

A federal court having jurisdiction over SEC subpoenas, in determining jurisdiction, must look to the Constitution and the federal statutes. Here a state attempts to confer jurisdiction by statute upon a federal court (or even a state court) to decide in a given case whether an obligation created by state statute—that of service of a subpoena upon a bank customer—may be waived. State law cannot enlarge or restrict, however, the jurisdiction of federal courts. *Poitra v. Demarrias*, 502 F.2d 23 (8th Cir. 1974) and *Markham v. City of Newport News*, 292 F.2d 711 (4th Cir. 1963).

The rules and regulations promulgated by the Commission, which have the force and effect of law,[1] do not require notification to the customer when a subpoena is issued to a bank calling for the production of records relating to the customer's account. The Tennessee statute establishes a prerequisite then which purports to require compliance by the Commission as a condition precedent to a bank's disclosure of its own records in response to a Commission subpoena.

This attempt by the state of Tennessee to place restrictions and additional requirements upon the Commission imposes an unreasonable burden and serves to hinder statutorily authorized investigations into possible securities law violations. Any actions taken by a customer contemplated by Tennessee law to assert his opposition to a subpoena will serve only to delay an SEC investigation. Such an effort on the part of a customer would be fruitless in light of federal court decisions which refuse to recognize any proprietary right of a depositor in bank records of his accounts. *United States v. Miller*, 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976). The Tennessee Bank Privacy Act therefore is an unnecessary burden upon interstate commerce because of detrimental effects on prompt SEC investigations to protect the public interest. If the SEC were forced to comply with the Tennessee statute, it would likewise have to comply with many different state acts relating to bank records, resulting in substantial frustration of the effective enforcement of the federal securities laws. *See Securities and Exchange Commission v. Brigadoon Scotch Distributing Company*, 480 F.2d 1047 (2d Cir. 1973).

The Bank Privacy Act of 1977 hinders the Commission in discharging its responsibilities under the federal securities laws. Such interference is expressly prohibited by Article VI, Clause 2 of the United States Constitution. *See McCulloch v. Maryland*, 17 U.S. 415, 4 L.Ed. 579 (1819).[2] *See also Johnson v. State of Maryland*, 254 U.S. 51, 41 S.Ct. 16, 65 L.Ed. 126 (1920).

The Bank has moved to dismiss the Commission's application because it fails to join the attorney general of the state of Tennessee, who the respondent claims is a

---

1. *Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187, 77 S.Ct. 257, 1 L.Ed.2d 231 (1956); *Standard Oil Co. of California v. Johnson*, 316 U.S. 481, 62 S.Ct. 1168, 86 L.Ed. 1611 (1942); *Lile v. Securities and Exchange Commission*, 324 F.2d 772 (9th Cir. 1963); *Otis Elevator Co. v. United Technologies Corp.*, 405 F.Supp. 960 (S.D.N.Y. 1975).

2. Note the language of Chief Justice Marshall: "It is the very essence of supremacy to remove all obstacles to [the federal government's] action within its own sphere, and so to modify every power vested in subordinate governments as to exempt its own operations from their own influence." 17 U.S. at 434.

necessary party to this action. The attorney general is not, however, a necessary or indispensable party since the Commission has not sought relief from him or from the State and since this Court is able to determine the constitutionality of a state statute without his joinder. *Liquifin Aktiengesellschaft v. Brennan*, 383 F.Supp. 978 (S.D. N.Y.1974). Therefore, the respondent's motion should be denied.

■ The Bank has further moved to join the Tennessee Attorney General, citing the duty imposed upon his office to defend the constitutionality of statutes enacted by the legislature. *See* T.C.A. § 8–609(8) (Supp. 1977). As pointed out by the attorney general, however, he is under no obligation to defend a statute when "he is of the opinion that such legislation is not constitutional." An Opinion of the Attorney General rendered on February 9, 1978 (a copy of which is attached as Exhibit A to this Order) makes it clear that application of the Bank Privacy Act to subpoenas issued by any federal agency acting under constitutional laws and within the scope of its authorization would constitute a violation of the Supremacy Clause of the United States Constitution.

■ Since federal laws create the duties and responsibilities of the Commission, such laws must prevail when there is a conflict between laws of the federal government properly enacted to enumerated powers and laws enacted by states which conflict with them. *Perez v. Campbell*, 402 U.S. 637, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971). Consequently, this Court finds the Bank Privacy Act unconstitutional as to any application to federal agencies acting within the scope of their lawful authority. It is therefore unnecessary for the SEC or any other federal agency to resort to the courts whenever a financial institution refuses to obey a subpoena on the basis of the agency's failure to comply with the customer notification requirement of the Tennessee Bank Privacy Act.

Judgment will accordingly be entered for the petitioner.

## APPENDIX

### EXHIBIT A

## State of Tennessee

OFFICE OF THE ATTORNEY GENERAL
450 JAMES ROBERTSON PARKWAY
NASHVILLE, TENNESSEE 37219
February 9, 1978

Joe H. Hemphill, Commissioner
Department of Banking
460 Capitol Hill Building
Nashville, Tennessee 37219

Dear Commissioner Hemphill:

In response to your request of January 13, 1978, and acting pursuant to T.C.A. § 8–609 as amended by Chapter 149, Acts of 1977, we hereby provide you with an opinion of this office as to the following question.

### QUESTION

Can a bank domiciled in Tennessee lawfully refuse to disclose financial records of a customer in response to a Federal subpoena, summons, warrant, or court order ("Federal Demand") where such Federal Demand has been served only upon the bank, and not upon the customer whose financial records are sought, and when the person who causes issuance of the Federal Demand has not obtained waiver of service upon the customer from a Court?

### OPINION

A bank may not refuse to make disclosure in response to a Federal Demand in reliance upon the provisions of the Bank Privacy Act of 1977, T.C.A. § 45–2601, *et seq.* (the "Act"). We do not at this time express any opinion as to other possible justifications for refusing to respond to a Federal Demand.

### ANALYSIS

A. *The Statutory Scheme*

Under § 3 of the Act, no fiduciary institution (which term includes banks domiciled

in Tennessee) may disclose any "financial records" (as defined) pursuant to any subpoena, summons, warrant or court order ("Demand") unless the customer authorizes the disclosure, or the Demand complies with the provisions of § 4 of the Act. Under § 4 the Demand must be "served" upon the customer as well as the bank, unless a court has waived service upon the customer for good cause. Exceptions are set forth in § 5, criminal penalties are provided in § 6 and § 7 is a broad severability provision.

**B.** *Application of the Act to Federal Demands*

The Act does not expressly state its applicability to Federal Demands, whether issued by Federal Courts, or Federal agencies acting within the scope of their authorization. Its applicability to both can be inferred from § 5 which exempts activities of "supervisory agencies" and certain activities pursuant to the Internal Revenue Code. In § 2, "supervisory agencies" is defined to include several Federal agencies. This creates a negative inference that other Federal agencies and, presumably, courts, are intended to be subjected to the provisions of the Act.

**C.** *Constitutionality of Application to Federal Demand*

1. Application of the Act to Federal Demands would have an impact on the manner in which they are served. Either the agency would serve the customer, or it would initiate court action to obtain a waiver. If the agency served the Federal Demand upon the customer its desire for secrecy, if any, would be impaired and its standard operating procedure would have to be revised. If to maintain secrecy it initiated court action its standard procedures would be seriously disrupted. For example, any court action by the staff of the Securities and Exchange Commission must be approved by the Commission itself, a process that requires several weeks. In doing so the formal order of investigation under which the Federal Demand issued would become a public document, defeating secrecy as well as certain privacy interests the Securities and Exchange Commission may

for its own reasons wish to protect. The Internal Revenue Service has rapid procedures for issuance of summons in order to be able to move rapidly against tax evaders. These provisions would be defeated by the Act. Other agencies will be able to show similar kinds of effects on their operations.

2. The Act appears to be modeled after Art. 11 § 24 of the Maryland Code Annotated. That Act states as its purpose:

> It is the purpose of this act to protect and preserve the confidential relationship between fiduciary institutions and their customers and to promote commerce by prescribing policies and procedures applicable to the disclosure of customer records by fiduciary institutions.

The customer's bank records in the hands of the bank are not entitled to protection under the Fourth and Fifth Amendments to the United States Constitution. *United States v. Miller*, 425 U.S. 435, 96 S.Ct. 1619 (1976); *Fisher v. United States*, 425 U.S. 391, 96 S.Ct. 1569 (1976); *California Bankers Association v. Shultz*, 416 U.S. 21, 94 S.Ct. 1494 (1974). Nor could it be said that the customer has a proprietary interest in the records sufficient to give him standing to assert the Fourth Amendment in an effort to resist a subpoena directed to the bank and ordering it to disclose his records. *See, e. g., Burrows v. Supreme Court of San Bernardino, Calif.*, 529 P.2d 590, 594 (Cal. 1975) and cases cited therein. However, this does not render the customer impotent to resist such a subpoena based on other grounds, such as overbreadth, lack of particularity, the First Amendment or an evidentiary privilege, such as the attorney-client privilege, under the proper circumstances. *Fisher, supra,* at 401, 1576.

Nor should it be thought that there is unanimity in the Supreme Court's view, expressed in *Miller, supra,* at 442–43, 1623, that a customer has no expectation of privacy in his bank records. See dissent of Justice Brennan in *Miller* at 447, quoting extensively from *Burrows, supra*. Justice Mosk, speaking for a unanimous California supreme court in *Burrows*, said:

It cannot be gainsaid that the customer of a bank expects that the documents, such as checks, which he transmits to the bank in the course of his business operations, will remain private, and that such an expectation is reasonable. The prosecution concedes as much, although it asserts that this expectation is not constitutionally cognizable. Representatives of several banks testified at the suppression hearing that information in their possession regarding a customer's account is deemed by them to be confidential.

. . . A bank customer's reasonable expectation is that, absent compulsion by legal process, the matters he reveals to the bank will be utilized by the bank only for internal banking purposes. Thus, we hold petitioner had a reasonable expectation that the bank would maintain the confidentiality of those papers which originated with him in check form and of the bank statements into which a record of those same checks had been transformed pursuant to internal bank practice.

. . . For all practical purposes, the disclosure by individuals or business firms of their financial affairs to a bank is not entirely volitional, since it is impossible to participate in the economic life of contemporary society without maintaining a bank account. In the course of such dealings, a depositor reveals many aspects of his personal affairs, opinions, habits and associations. Indeed, the totality of bank records provides a virtual current biography. *Burrows, supra,* at 593–96.

This is an area where the courts have developed standards lower than those thought necessary by the legislature. California subsequently enacted legislation similar to the Act, though by its terms it is limited to Demands issued by California state and local governments and agencies. And Maryland and Pennsylvania have adopted similar laws.

3. From the analysis in part 2, above, we can infer the purpose of the Act. On its face it does not create any substantive right in the customer to resist the Federal Demand in court. It merely requires that the customer have at least the information that some Federal action is being taken with respect to his records. It imposes the burden of providing that information on the agency making the Federal Demand, and it is the constitutionality of that imposition that must be considered.

4. Article VI, Clause 2 of the United States Constitution, the Supremacy Clause, provides as follows:

This Constitution, and the laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

From earliest times this clause has been given the strictest construction. *M'Culloch v. Maryland,* 17 U.S. 316 (1819) involved a transaction tax imposed by Maryland upon a branch of the Bank of the United States located in Baltimore, which was not applied to state chartered banks and which included criminal penalties. After upholding the constitutionality of the laws creating the bank, the Court discusses the principles underlying the Supremacy Clause, and strikes down the statute.

The Court through Chief Justice Marshall says in considering the constitutionality of the Maryland law that the Constitution imposes direct limits on the power of the states to lay and collect taxes, and the question is now whether the Supremacy Clause should be applied to this instance of taxation.

In making this construction, no principle not declared can be admissible, which would defeat the legitimate operations of a supreme government. It is of the very essence of supremacy to remove all obstacles to its action within its own sphere, and so to modify every power vested in subordinate governments as to exempt its own operations from their own influence. *Id.* at 427.

On the question of whether a state could tax an instrumentality of the Federal government, Chief Justice Marshall said:

. . . [T]he states have no power, by taxation or otherwise, to retard, impede, burden, or in any manner control the operations of the constitutional laws enacted by Congress to carry into execution the powers vested in the general government. This is, we think, the unavoidable consequence of that supremacy which the constitution has declared.

*Id.* at 436.

Shortly after *M'Culloch*, Chief Justice Marshall handed down the Court's decision in the famous case of *Gibbons v. Ogden*, 22 U.S. 1 (1824). That case was a challenge to the constitutionality of a New York law giving Robert Livingston and Robert Fulton exclusive navigation rights in all waters within its jurisdiction. Appellee had obtained a franchise, and sued Appellant to stop his infringement, basing his argument on the New York statute. Appellant argued that the New York law conflicted with Art. I, § 8 of the Commerce Clause.

. . . In argument, however, it has been contended that if a law, passed by a state in the exercise of its acknowledged sovereignty, comes into conflict with a law passed by Congress in pursuance of the Constitution, they affect the subject, and each other, like equal opposing powers.

But the framers of our Constitution foresaw this state of affairs, and provided for it by declaring the supremacy not only of itself, but of the laws made in pursuance of it. The nullity of any act, inconsistent with the constitution, is produced by the declaration that the constitution is the supreme law. The appropriate application of that part of the clause which confers the same supremacy on laws and treaties, is to such acts of the state legislature as do not transcend their powers, but, though enacted in the execution of acknowledged state powers, interfere with or are contrary to the laws of Congress, made in pursuance of the constitution. . . . In every such case, the act of Congress . . . is supreme; and the law of the state, though enacted in the exercise of powers not controverted, must yield to it. *Id.* at 210–211.

The Supreme Court has been no less firm in upholding regulations of Federal agencies against conflicting state law. In *Free v. Bland*, 369 U.S. 663, 82 S.Ct. 1089 (1962), the conflict was between state community property laws and a Treasury regulation on survivorship rights in U.S. Savings Bonds. "Thus, the survivorship provision is a federal law which must prevail if it conflicts with a state law." *Id.* at 668, 1093.

The Court has shown no willingness to back down from these sweeping decisions on the scope of the Supremacy Clause. Thus, in the case of *Perez v. Campbell*, 402 U.S. 637, 91 S.Ct. 1704 (1971), Justice White rejected the theory of two earlier cases that the test of the Supremacy Clause was whether the state's purpose in enacting legislation conflicting with Federal law as that of frustrating the Federal government, or some other acceptable state purpose.

. . . [W]e conclude that *Kesler* [*v. Department of Public Safety*, 369 U.S. 153, 82 S.Ct. 807 (1962)] and *Reitz* [*v. Mealey*, 314 U.S. 33, 62 S.Ct. 24 (1941)] can have no authoritative effect to the extent they are inconsistent with the controlling principle that any state legislation which frustrates the full effectiveness of federal law is rendered invalid by the Supremacy Clause. *Id.* at 625, 1712.

*Perez* was a case involving a conflict between Arizona's driver licensing law and the Federal Bankruptcy Laws. The Arizona law provided that if a judgment for damages based on operation of a car goes unpaid for sixty (60) days, the operator's drivers license is revoked and remains revoked until the judgment is paid and the operator provides proof of financial responsibility. It specifically provides that this revocation is not to be affected by discharge of the judgment in bankruptcy. It is this last part which the Court held frustrated the purpose of the Bankruptcy Act

. . . to give debtors a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of pre-existing debt. *Id.* at 648, 1710–11.

The foregoing cases can be seen generally as involving a state law which purport to affect directly or indirectly established Federal law. Another line of cases covers areas where the statute is enacted in the exercise of the "historic police powers of the States." *Florida Lime and Avocado Growers, Inc. v. Paul*, 373 U.S. 132 83 S.Ct. 1210 (1963) at 146. Here as in all Supremacy Clause cases, a two-step analysis must be carried out. *See Perez, supra.* The first step is to determine the precise construction to be given the two statutes. The second is to determine whether the state statute "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Perez, supra,* at 649, 1711; quoting *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399 (1941). In this second line of cases, a third criteria must be considered, whether pre-emption was the clear and manifest purpose of the Congress. *Florida Lime and Avocado Growers, Inc., supra,* at 146, 1219.

The *Florida Lime* case involved a conflict between a California statute prohibiting sale of avocados with less than 8% of oil, by weight; and a federally-sanctioned marketing order adopted in South Florida and prohibiting marketing of avocados picked before certain dates set by a commission selected under Federal law. The Court characterized the Florida marketing order as regulating standards for picking, processing and transporting avocados; the California law was characterized as covering distribution and retail sale of the avocados.

> Congressional regulation of one end of the stream of commerce does not ipso facto, oust all state regulation at the other end. *Id.* at 145, 1219.

And on the question of pre-emption where there is simultaneous occupation of the field, the Court stated that the test is whether Federal displacement " . . . was the clear and manifest purpose of Congress." *Id.* at 146, 1219, quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 146, 1152 (1947). Presumably that intent is to be determined from the Federal statute itself and from various other tests.

5. We turn now from this general analysis of the Supremacy Clause to the specific facts at hand. There are no cases precisely on point. However, closely parallel cases can be found in the area of grand jury subpoenas. The only apparent difference between a grand jury subpoena and a Federal Demand from an agency seems to be the source of constitutional authorization; the former presumably springs from Article III and the Seventh Amendment, the latter probably from Article I. In a case styled *In re New York State Sales Tax Records,* 382 F.Supp. 1205 (W.D.N.Y.1974), the Federal grand jury subpoenaed certain sales tax records held by the custodian of the records in New York. New York law permitted such disclosure only pursuant to "proper judicial order or as otherwise provided by law", and set out certain criminal penalties. The court cited the Supremacy Clause and struck down the entire law, including the criminal parts, insofar as it could be construed to bar the response to the grand jury's subpoena.

In a Tennessee case, *In re First Tennessee Bank N.A. Memphis,* (W.D.Tenn. No. 1268–Misc.) the Act was held not to apply to Federal grand jury subpoenas, principally upon the ground that the Act governed procedural and not substantive matters and therefore the Federal Court would follow Federal law. However, apparently the Supremacy Clause was not argued to the court.

Finally, in *United States v. Grand Jury Investigation,* 417 F.Supp. 389 (E.D.Pa., 1976), the Federal Court denied a motion to quash a grand jury subpoena made by a savings and loan association based upon a Pennsylvania statute governing disclosure of records of savings and loan associations. The Court did not even reach the Supremacy Clause issue " . . . we do not believe it was intended to, or can, thwart a proper federal grand jury investigation." *Id.* at 392.

With respect to criminal investigations generally, this office has already given its opinion that it was not the intent of the Act to "thwart criminal investigation by proper

authorities." See opinion letter to Mr. Carl K. Kirkpatrick, October 27, 1977, on file at this office. Certainly this opinion would apply to Federal investigations as well as those of state law enforcement officers.

## CONCLUSION

The Supremacy Clause prohibits the State of Tennessee from applying its police power in any way which would hinder any Federal governmental unit from acting within its constitutional authority regardless of how slight the burden may be. This is so regardless of the importance of the interest the State seeks to protect, and which the Federal government seeks to invade. This rule has been applied to cases indistinguishable from those cases to which the Act applies. The Act may not be relied upon by a fiduciary institution to refuse to respond to a Federal Demand.

Very truly yours,

/s/ Edwin M. Walker

EDWIN M. WALKER
Assistant Attorney General